## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| AMBER FORD, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 6:19-cv-384-JDK |
| | § | |
| ANDERSON COUNTY, TEXAS, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This case arises out of the tragic death of Rhonda Gay Newsome while in the custody of the Anderson County Jail.  Plaintiffs allege that Defendants violated Newsome's Fourteenth Amendment rights by ignoring her deteriorating medical condition in the days leading up to her death.  Defendants assert that they provided Newsome with appropriate medical care and were in the process of treating her when she died.  The individual Defendants thus argue that they are entitled to qualified immunity because they were not deliberately indifferent to her serious medical needs and their conduct was objectively reasonable in light of clearly established law.

As explained below, the Court holds that the moving Defendants are entitled to qualified immunity and **GRANTS** their motions for summary judgment.  Docket Nos. 208, 209, 210.

## I.

Unless otherwise noted, the following facts are undisputed.  The Court views all inferences to be drawn from the facts "in the light most favorable to the party opposing the motion," Plaintiffs here.  *E.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.

Rhonda Gay Newsome was arrested on March 9, 2018, for Aggravated Assault with a Deadly Weapon.  Docket No. 209, Ex. N at AC0283.  According to the police report, Newsome attempted to stab her adult daughter with a pair of scissors following an argument.  *Id.*  Newsome was medically cleared at Palestine Regional Medical Center before being transported to the Anderson County Jail.  Docket No. 209 at 10; *id.*, Ex. M at 000335–37; Docket No. 210 at 3; *id.*, Ex. A at 3.  Her lab results were "unremarkable," showing "normal" levels of blood urea nitrogen ("BUN") and glomerular filtration rate ("GFR"), which indicate kidney function.  Docket No. 51 ¶ 44 n.3.  The treating physician prescribed Newsome ibuprofen and Robaxin as needed for pain associated with strains and sprains.  Docket No. 209, Ex. N at AC0356–58.  Newsome was then taken to the Anderson County Jail pretrial detention facility, where she was processed in the early morning hours of March 10.  Docket No. 209, Ex. N at AC0277; Docket No. 210, Ex. A at 3.

Newsome was fifty years old when she was booked into the jail.  Docket No. 209 at 2.  According to her intake form, Newsome suffered from several preexisting medical conditions, including Addison's disease (a hormonal disorder), fibromyalgia, seizures, joint or disc disease, spinal stenosis, and osteoarthritis.  Docket No. 51 ¶ 46

n.4; Docket No. 209, Ex. A at 27; *id.*, Ex. N at AC0373.  The form also indicates that Newsome was taking ten different prescription medications at the time, admitted to having a history of drug and alcohol abuse, was taking anti-depressants, stated "multiple times" that she wanted to kill herself, had attempted suicide in the past, experienced "ringing in ears" and auditory hallucinations, and suffered from both PTSD and bipolar disorder.  Docket No. 209, Ex. M at 000158.  Newsome's daughter, Plaintiff Amber Ford, later revealed additional health-related conditions that Newsome did not disclose at intake, including that Newsome had previously undergone seven different back and neck surgeries and "had a lot of different issues with that," had a history of abusing methamphetamine, and was "presumably . . . using meth" at the time Newsome attacked Ford.  Docket No. 209, Ex. G at 19, 24–25.

The following day, on March 11, nurse Timothy Green personally examined Newsome.  *Id.*, Ex. N at AC0394.  Green is a critical care registered nurse who was a part-time employee of Anderson County during the relevant period.  *Id.*, Ex. A at 29; Docket No. 208, Ex. U.  Green and Newsome discussed her medical history and medications, and Green instituted a treatment plan to "continue the medications that [Newsome] was on."  Docket No. 209, Ex. A at 26.  Green also directed "the jail staff to monitor [Newsome] as best they could and . . . notify Dr. [Adam] Corley [about any changes in her condition]."  Docket No. 209 at 4; *id.*, Ex. A at 25–27.  Dr. Corley is a medical doctor who was serving as the jail's medical director.  Docket No. 209, Ex. C at 29.  Green also attempted to obtain Newsome's medical records from her physicians, but the records were never sent.  *Id.*, Ex. A at 96–97, 107.

From March 10 until Newsome's death on June 15, Defendants responded to Newsome's medical needs on multiple occasions.

**March 10 to June 14.**   During the months of March, April, and May, Newsome periodically complained of minor medical issues, including acid reflux, lower back pain, and flatulence.   Docket No. 209, Ex. N at AC0328, 0379, 0388–89. She also requested refills of various prescriptions, access to the medications she had brought with her to the jail, and a "muscle rub" for neck and back pain.   *Id.*, Ex. N at AC0324, 0326, 0372, 0376, 0378–79.   The Defendant jailers documented these issues, generally responded to her requests, and in some instances conferred with or referred her to nurse Green or Dr. Corley.   *Id.*   On April 4, Newsome mistakenly took an extra blood pressure pill.   Green treated her with a liter of saline, placed her on medical observation with repeat blood pressure readings, and personally examined her on April 4 and 5.   *Id.* at AC0374–75, 0394.   Green's written notes of the April 5 visit indicate that Newsome's blood pressure had stabilized and that he would attempt again to obtain her medical records.   *Id.* at AC0394.

On April 16 and 18, Newsome complained of acid reflux.   *Id.* at AC0328, 0378. Defendant jailers initially gave her over-the-counter medication, and Green followed up by personally examining Newsome on April 20.   Green noted leg swelling and a stable blood pressure reading, and he stated that he would order a blood draw the following day.   *Id.* at AC0393.   Green also placed Newsome on medical observation, during which jailers observed and logged her actions every fifteen minutes.   *Id.* at

AC0377.  The observation log shows that Newsome spent the day lying down or sitting at the window and showed no signs that raised concern.  *Id*.

On May 11, Dr. Corley personally examined Newsome at the jail.  His written notes state that Newsome's "chief complaint" was "gas," she had "a long history of neck pain with multiple surgeries," and she was "in no distress" during the examination.  Dr. Corley logged Newsome's vital signs, indicated that her heartrate and rhythm were "normal" and "regular," and stated that her "mood and affect are normal."  *Id*. at AC0388–89.  Dr. Corley also noted that "[a]mong her problems is that she has Addison disease [and] multiple neck surgeries," but that "[e]valuation of her past history is complicated because the patient is a poor historian."  *Id*.  Dr. Corley stated that the jail had requested Newsome's medical records from her primary care physician and that he would "follow up on this."  *Id*.

There were no further substantiated incidents between May 12 and June 14.  Green later testified that he and Newsome "had a very open line of communication" regarding her medical treatment and that she "wasn't a problematic patient at all."  Docket No. 209, Ex. A at 109.

**June 14 to June 15.**  Late on June 14, Newsome began vomiting and experiencing stomach pain and pain in her right flank.  Docket No. 209, Ex. A at 118–123; *id*. at AC0393; Docket No. 218, Ex. I at 1.  She complained to jail staff, who contacted Green.  Green went to the jail around midnight, personally examined Newsome, and stated that he consulted by phone with Dr. Corley.  Docket No. 209, Ex. A at 58–60, 106, 115.  At Dr. Corley's instruction, Green administered one liter of

saline and fifty milligrams of Phenergan to treat Newsome's nausea.  *Id*. at 58–60.

Green testified that Newsome "was talking, alert, oriented" during the examination.

*Id*. at 120.  "She complained of some mild nausea and some vomiting – or the two –

one or two episodes of vomiting."  *Id*.  Her "[v]ital signs were stable," and she did not

have "shortness of breath or chest pain."  *Id*.; *id*., Ex. N at AC0393.  Green did not

believe Newsome needed to go to the hospital, but he asked her if she wanted to go.

She declined.  Docket No. 209, Ex. A at 123.[1]

After treating Newsome, Green placed her on medical observation and

instructed jail staff to move her to a holding cell where they could observe her more

easily throughout the night.  *Id*., Ex. N at AC0393; Ex. A at 35; Docket No. 218, Ex. I.

During the night, other inmates heard Newsome moaning and requesting medical

treatment.  Docket No. 214, Ex. O; *id*., Ex. P; *id*., Ex. Q; *see also* Docket No. 218,

Ex. E; *id*., Ex. F; *id*., Ex. G.[2]  Although the written observation logs for June 14–15

are not before the Court, the parties agree that jail staff checked on Newsome

---

[1] Plaintiffs claim that there is a fact dispute about whether Green personally examined and treated Newsome the night of June 14, but Plaintiffs cite only the testimony of another detainee, who stated merely that she never saw Green in the jail processing center, and a jailer, who stated that he did not recall whether Green gave Newsome medicine and saline that night.  Docket No. 214 at 9 (citing *id*., Ex. S at 1; *id*., Ex. U at 10).  Such evidence is insufficient to create a fact dispute about whether Green examined Newsome that night.  *See, e.g.*, *Dickey v. Baptist Mem'l Hosp.–N. Miss.*, 146 F.3d 262, 266 n.1 (5th Cir. 1998) ("The mere fact that [the witness] does not remember the alleged phone conversation, however, is not enough, by itself, to create a genuine issue of material fact.").

[2] Defendants object to the affidavits of detainees Ashley Lyons, Charles Sweet, Edward Jimenez, and Kelli Schuckers (Docket No. 218, Exs. E, F, G, I) on the grounds of hearsay, double hearsay, and a lack of personal knowledge.  Docket No. 225 at 2–4.  Defendants claim that the affidavits lack a factual basis for knowledge of Newsome's conduct and/or the affiants were incarcerated.  *Id*.  The personal knowledge requirement, however, is satisfied when "the court can reasonably infer personal knowledge from the affidavit itself."  *Campbell v. PBL*, 744 F. App'x 192, 198 (5th Cir. 2018).  And the affidavits here state that the affiants were in holding cells in close proximity to Newsome and were able to perceive and observe her statements.  The Court therefore **OVERRULES** Defendants' objections.

thirty-one times during the seventeen-hour period between midnight of June 14 and her death on the evening of June 15.  Docket No. 210 at 24; Docket No. 218 at 14 (citing *id.*, Ex. A (video footage of Newsome)); *see also* Docket No. 214, Ex. M.  Several jailers, moreover, testified that they observed Newsome throughout the night and that "she did not look like she was having a medical emergency."  Docket No. 210, Ex. B at 2; *see also id.*, Ex. E at 2 (Matthew Wickersham stating that Newsome "looked to me like she did not feel good, but I never thought [she] was having a medical emergency until I saw her unresponsive in her wheelchair" the following day); *id.* Ex. G at 2 (same from Dakota Hughes).  At least one detainee reported hearing Newsome "crying out loudly" for help for about two hours that night.  Docket No. 218, Ex. F.  At 2:02 a.m., Green spoke with jail staff by telephone about a request from Newsome to take a shower.  Docket No. 218, Ex. B at 116.

At approximately 7:30 a.m. on June 15, Green again examined Newsome at the jail.  Green documented that Newsome was nauseated, "had thrown up brown colored fluid but was still able to tolerate water," "had been eating chips and food," and complained of "right flank area pain."  Docket No. 209, Ex. N at AC0390; *id.*, Ex. A at 124; Docket No. 218, Ex. B at 121.  Green drew a blood sample and gave Newsome Phenergan and Tylenol #4.  Docket No. 209, Ex. N at AC0390.  Green again did not believe that Newsome needed to go to the hospital, but he offered anyway, and she declined.  Docket No. 209, Ex. A at 122–23.  Green explained to Newsome that "most likely Dr. Corley would order a possiable [sic] CT scan and send [her] to [the] ER for further evaluation."  *Id.*  Green believed that Newsome "understood all

information given," and then he took her blood sample to the Palestine Regional Medical Center for testing.  *Id*.; *see also id*., Ex. J at 11.  Green later recalled that Newsome's "symptoms were all over the place, nothing you could really nail down at that time."  *Id*., Ex. A at 61.

After Green's visit on the morning of June 15, jail staff continued monitoring Newsome, checking on her at least eighteen times that day.  Docket No. 218 at 14 (citing *id*., Ex. A).  Various jailers noted that Newsome "looked to me like she did not feel good" and that she "did not feel well because she threw or spit up."  Docket No. 210, Ex. E at 2; *id*., Ex. G at 2.  One detainee said that she heard Newsome "moaning and groaning" throughout the day.  Docket No. 218, Ex. E.  But none of the jailers believed Newsome was experiencing a medical emergency.  Docket No. 210, Ex. A at 4; *id*., Ex. B at 2; *id*., Ex. E at 2; *id*., Ex. G at 2; *id*., Ex. L at 34.

One point of dispute is when Green learned of Newsome's blood test results. The lab technician testified that he called Green at approximately 10:40 a.m. on June 15 and reported a "critical value."  Docket No. 209, Ex. J at 13–14.  The lab report itself indicates that Newsome's blood urea nitrogen ("BUN") level was high and her potassium level was low, and that the lab technician notified Green at 10:39 a.m.  *Id*., Ex. N at AC0476.  The technician explained that the system would not allow him to finalize a report until he "report[ed] a critical value."  *Id*., Ex. J at 14.  The technician, however, could not "recall the critical values that I gave to Tim Green" and acknowledged that he could not testify "as to what Green might have actually subjectively heard."  *Id*. at 18.

8

Green for his part repeatedly testified that he did not receive any critical values the morning of June 15.  *Id.*, Ex. A at 22–23, 38–39, 43–44, 80, 133.  After dropping off Newsome's blood draw, Green had traveled to see patients in a neighboring county.  Docket No. 209, Ex. A at 29; Docket No. 214, Ex. L, P-1 at 4:24.[3] Green testified that "I do remember having a conversation with [the technician] that morning, but I don't think there [were] any critical values transpired during that time."  Docket No. 209, Ex. A at 39.  If Green had received the critical values that morning, he stated that "I would immediately have called Dr. Corley."  *Id.* at 42–43, 79–80, 129, 133–34.  Green acknowledged that "there's always the possibility maybe, but I just don't see me sitting on that type of lab."  Docket No. 218, Ex. C at 91–100.

At approximately 4:20 p.m. on June 15, jail staff assisted Newsome to the toilet located in her cell.  Docket No. 210, Ex. B at 2–3; *id.*, Ex. E at 2; *id.*, Ex. G at 2; Docket No. 214, Ex. M at 06/15/2018 4:19:44–4:28:46 PM.  At 4:55 p.m., Sergeant Matthew Wickersham checked on Newsome and discovered that she had no pulse and was not breathing.  Docket No. 210, Ex. E at 2–3; Docket No. 214, Ex. M at 06/15/2018 5:06:42 PM.  Multiple jailers began attempting to aid Newsome.  *Id.*  Wickersham called Green, who instructed him to call an ambulance, and then called emergency medical services.  Docket No. 210, Ex. E at 3.  Around the same time, Green picked up Newsome's lab report from the Medical Center and immediately contacted Dr. Corley.

---

[3] Defendants raise hearsay objections to Exhibit L, the recording of an interview of Green by Texas law enforcement.  Docket No. 222 at 5.  But their objections are primarily targeted at portions of the recording purportedly containing statements of lab technician Wesley Wood, which the Court does not rely upon.  *Id.* at 5 nn.1–2.  Because the relied-upon remarks are solely those made by Green, and are thus admissible as statements by a party opponent, Defendants' objections to Exhibit L are **OVERRULED**.  *See* FED. R. EVID. 801(d)(2).

Docket No. 208, Ex. S at 0003–04, 0075; Docket No. 209 at 10–11; *id.*, Ex. A at 23, 48–49, 134–35; *id.*, Ex. N at AC0392–93.  Jail staff took turns performing CPR on Newsome until EMS arrived.  Docket No. 210, Ex. E at 3.

Newsome was pronounced dead at the hospital at 5:37 p.m.  Docket No. 209, Ex. N at AC0257; Docket No. 210, Ex. E at 3.  The autopsy indicated that Newsome died of "complications due to Addison's disease, hypertensive and atherosclerotic cardiovascular disease, obesity, and pulmonary emphysema."  Docket No. 209, Ex. M at 000529–534.

## B.

Plaintiffs filed this lawsuit on August 21, 2019.  Docket No. 1.  Plaintiffs are Newsome's daughter Amber Ford, her son Regan Kimbrough, and her mother and father, Ann Newsome[4] and Donald Newsome.  Docket No. 51 ¶¶ 1–4.  Defendants are Anderson County, Texas; Greg Taylor, the Sheriff of Anderson County during the relevant period; jailers Robin Jones, Jonathan Strong, Jessica Carpenter, Alicia Wilson, Matthew Wickersham, Travis Wesson, Dakota Hughes, and Todd Choate ("Jailer Defendants"); nurse Timothy Green; Dr. Adam Corley; and TAKET Holdings, LLC, a medical services company owned by Green and Corley.  *Id.* ¶¶ 5–17.

Plaintiffs allege that Defendants were deliberately indifferent to Newsome's serious medical needs and thus violated her Fourteenth Amendment rights as a pretrial detainee.  *Id.* ¶¶ 103–128.  Plaintiffs seek damages under 42 U.S.C. § 1983.  *Id.* ¶¶ 129–31.  All Defendants except Anderson County assert qualified immunity.

---

[4] In accordance with Federal Rule of Civil Procedure 25(a)(2), Plaintiffs notified the Court that Ms. Ann Newsome died on March 24, 2022.  Docket No. 245; *id.*, Ex. A.

Some of these Defendants previously moved to dismiss the complaint based on qualified immunity, and the Court deferred and carried the issue until additional facts could be determined. *See* Docket No. 41.

Following nearly a year of discovery, Defendants now move for summary judgment on qualified immunity grounds as follows: (1) Dr. Corley and TAKET argue that there is no evidence they were subjectively aware of any serious risk to Newsome's health (Docket No. 208); (2) Green contends that he provided extensive care to Newsome and that there is no evidence he was deliberately indifferent to a serious medical need (Docket No. 209); and (3) Sheriff Taylor and jailers Jones, Strong, Carpenter, Wilson, Wickersham, Wesson, Hughes, and Choate argue that Plaintiffs cannot identify any action on their part that violated Newsome's constitutional rights and, alternatively, their conduct was objectively reasonable as a matter of law (Docket No. 210).

## II.

The parties have raised various objections to evidence submitted in support of the pending motions.[5]  Under Federal Rule of Civil Procedure 56(c)(2), a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Additionally, evidentiary objections must "state[] the specific ground" for the objection "unless it was apparent from the context."  FED. R. EVID. 103(a)(1)(B).  "A loosely formulated and imprecise objection will not preserve error."  *United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998);

---

[5] Defendants' objections are discussed in footnotes as relevant throughout the Order.

*Gotch v. UPS Ground Freight, Inc.*, 2014 WL 4071573, at *1 (S.D. Tex. July 25, 2014) (overruling plaintiff's "vague objection" that "does not identify the specific facts to which Plaintiff objects").  Although the Court has considered all the evidence before it in deciding the summary judgment motions, it need not rule on objections to evidence not relied upon in making its determination.  *See, e.g.*, *Kim v. Umami Grill & Sushi, LLC*, 2019 WL 954899, at *2 (S.D. Tex. Feb. 27, 2019).

Throughout their responses and sur-replies to Defendants' motions, Plaintiffs object at least thirty-six times to various Defendants' statements as "self-serving."  *See* Docket Nos. 214, 218, 231, 233, 235.  A party's own testimony, however, is not excluded as incompetent solely because it is "self serving."  *See C.R. Pittman Const. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) (citing several cases).  Rather, "a 'party's own affidavit, containing relevant information of which [the party] has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.'"  *Id.* (quoting *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000)).  Because Plaintiffs have not shown that Defendants' statements are deficient under Federal Rule of Civil Procedure 56(c)(4), the Court **OVERRULES** Plaintiffs' objections to Defendants' "self-serving" statements.

Plaintiffs also repeatedly claim that Defendants made statements in their affidavits "that are not grounded in fact" or that lack a factual basis.  *See, e.g.*, Docket No. 218 at 2–6.  The statements to which Plaintiffs object, however, are based in fact because they recount the affiants' personal observations of, interactions with, and

opinions about Newsome, or because they reflect the affiants' personal awareness of jail policies in place at the time. *See* Docket No. 210, Exs. A, B, E, G. The affidavits are also based on the affiants' personal knowledge. *See* FED. R. EVID. 602 advisory committee's note (defining "personal knowledge" to mean that a witness "must have had an opportunity to observe, and must have actually observed the fact"); *United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999) ("Personal knowledge can include inferences and opinions, so long as they are grounded in personal observation and experience.") (citation omitted); *Ramirez v. Load Trail, LLC*, 333 F.R.D. 89, 96 (E.D. Tex. 2019) (holding that declarations were "adequately based on 'personal knowledge'" where declarant "makes statements and inferences regarding other [people] he has knowledge of as his position allowed him to interact with and observe other [people]"); *cf. Meadaa v. K.A.P. Enterprises, L.L.C.*, 756 F.3d 875, 881 (5th Cir. 2014 (affirming district court's holding that "affidavit lack[ed] the factual basis" for affiant's conclusions where "affidavit failed to meet the personal knowledge requirement of Federal Rule of Civil Procedure 56"). Further, an affidavit is, "by definition, part of the summary judgment record, and itself provides a reason to believe it has a basis in fact." *Phoenix Aero Aviation Eng'g, Ltd. v. Trace Engines, L.P.*, 2012 WL 13032937, at *4 (W.D. Tex. June 22, 2012). Accordingly, such general objections are **OVERRULED**.

Plaintiffs object broadly under Rule 402 (relevance) and Rule 403 (unfair prejudice) to evidence pertaining to the charges against Newsome and her history of drug abuse. Docket No. 214 at 2–3. This case, however, arises directly from

Newsome's detention, health condition, and death.  The evidence is therefore relevant to the extent it relates to Newsome's health, and the Court does not rely on it for any other purpose.  *See, e.g.*, *McGrew v. Roundtree*, 2013 WL 4543035, at *2 (M.D. La. Aug. 27, 2013) (holding inmate's mental health record was relevant and more probative than prejudicial where inmate alleged defendants' actions caused "physical and emotional injuries").  Further, the Court finds that the evidence is not unduly prejudicial when considered for this limited purpose.  *See, e.g.*, *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F. 2d 517, 519 (5th Cir. 1981).  Accordingly, these objections are **OVERRULED**.

Finally, Plaintiffs raise several specific objections to the affidavits of Defendants Sheriff Taylor, Choate, Carpenter, Hughes, and Wickersham.  Docket No. 218 at 2–8.  Plaintiffs object that (1) some of their testimony "violates the dead man's statute," (2) the "statements therein are gone to [sic] contradictory" or are "effort[s] to impeach previous testimony," (3) Defendants' counsel objected to questions about jail training and policies as outside the scope of qualified immunity discovery, and (4) Defendants failed to disclose documentation of a "stomach bug" in the jail and of the "Jail's Field Training Program."  *Id.*

These objections are without merit.  *First*, the so-called "Dead Man's Rule"—a Texas evidentiary rule—does not apply to cases involving a "federal question-based civil rights inquiry under § 1983."  *Longoria by Longoria v. Wilson*, 730 F.2d 300, 304 (5th Cir. 1984).

*Second*, Plaintiffs fail to identify the allegedly "contradictory" statements to which they object.  When objectionable evidence is cited by Plaintiffs at all, the objections frequently cite to paragraphs that do not exist.  *See, e.g.*, Docket No. 218 at 5 (purportedly citing "paragraph 4, page 2" of Docket No. 210, Ex. E at 2, despite page 2 containing only three paragraphs).  And "[t]he court will not 'scour the record' to determine whether summary judgment is proper when the evidence had not been properly designated."  *377 Realty Partners, L.P. v. Taffarello*, 561 F. Supp. 2d 659, 663 (E.D. Tex. 2007) (citing *Hucker v. City of Beaumont*, 144 F. Supp. 2d 696, 700 (E.D. Tex. 2001)).  Where Plaintiffs do provide more detail, they simply point to different perspectives that various Defendants highlighted in their affidavits, not contradictions.  Different perspectives are not contradictions, and Plaintiffs ultimately provide "no specific argument as to how and why those two affidavits contradict with any deposition testimony provided by those two affiants or with [another] affidavit such that the two affidavits are inadmissible."  *Gen. Star Indem. Co. v. Sherry Brooke Revocable Tr.*, 243 F. Supp. 2d 605, 623 (W.D. Tex. 2001) (overruling objection).

*Third*, Plaintiffs' complaint about opposing counsel's training and policy objections cites only to the depositions of Wickersham and Choate—not Sheriff Taylor.  Docket No. 218 at 8.  And Plaintiffs had full opportunity to depose Anderson County policymaker Sheriff Taylor and discussed the topics of jail training and policies multiple times throughout that deposition.  *See* Docket No. 218, Ex. J at 7, 9,

10, 33.  Objections by counsel of other Defendants did not prevent Plaintiffs from examining Sheriff Taylor on any questions they had regarding these issues.

*Fourth*, Plaintiffs cite no caselaw or other authority requiring documentation of a stomach bug at the jail.  If Plaintiffs had believed Defendants failed to disclose certain documents, the proper remedy would have been a motion to compel, which Plaintiffs did not file.  *See, e.g.*, *Rogers v. United States*, 2006 WL 616908, at \*7 (W.D. Tex. Mar. 8, 2006) ("[T]he proper remedy for failure to make required disclosures is a motion to compel, which was not sought . . . at any time.").

Accordingly, Plaintiffs' objections are **OVERRULED**.

## III.

Under 42 U.S.C. § 1983, any person who, acting under color of law, deprives a citizen "or other person . . . of any rights, privilege, or immunities secured by the Constitution and the laws . . . shall be liable to the party injured in an action at law." 42 U.S.C. § 1983; *see also, e.g.*, *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).  A state official sued under § 1983 may assert the defense of qualified immunity.  *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992).  Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is a powerful defense, and it protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

16

## A.

To determine if an official is entitled to qualified immunity, the Court employs a two-step inquiry.  First, the Court determines "whether the undisputed facts and the disputed facts, accepting the plaintiff's version of the disputed facts as true, constitute a violation of a constitutional right."  *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015); *see also, e.g.*, *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019).   Second, the Court considers "whether the defendant's conduct was 'objectively reasonable in light of clearly established law.'"  *Carroll*, 800 F.3d at 169 (quoting *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001)); *Valderas*, 937 F.3d at 389; *accord, e.g.*, *Brown v. Callahan*, 623 F.3d 249, 252–53 (5th Cir. 2010) (the court must determine "whether an official's conduct violated a constitutional right," "whether the right was clearly established at the time of the violation," and if so, "whether qualified immunity is still appropriate because the defendant's actions were "objectively reasonable" in light of "law which was clearly established at the time of the disputed action") (quoting *Collins v. Ainsworth,* 382 F.3d 529, 537 (5th Cir. 2004)).

Here, Plaintiffs allege that Defendants violated Newsome's Fourteenth Amendment rights while detaining her before trial.  Docket No. 51 ¶¶ 103, 108, 112, 116, 120, 125.  The Court explained in a prior order that, to prove this claim, Plaintiffs must demonstrate Defendants subjectively knew of "a substantial risk of serious harm" to Newsome but responded with "deliberate indifference to that risk."  Docket No. 41 (quoting cases); *see also, e.g.*, *Burns v. City of Galveston*, 905 F.2d 100, 103 (5th Cir. 1990) (detainees have a Fourteenth Amendment right "not to have serious

medical needs treated with deliberate indifference"); *see also Thompson*, 245 F.3d at 457 (same).   "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 528 (5th Cir. 1999) (a medical need is serious when it is "obvious to the lay person or supported by medical evidence, like a physician's diagnosis"); *see also Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (same).

Deliberate indifference, moreover, "is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.,* 239 F.3d 752, 756 (5th Cir. 2001).   "To meet this standard, a plaintiff must establish more than mere negligence, unreasonable response, or medical malpractice." *Estate of Cheney v. Collier*, 560 F. App'x 271, 273 (5th Cir. 2014).   An official "acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Gobert*, 463 F.3d at 346 (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)); *see also Domino*, 239 F.3d at 756 (deliberate indifference means that prison officials "refused to treat [the inmate], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs").   "Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk." *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994).   This standard "does not require

the plaintiff to 'show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Estate of Cheney*, 560 F. App'x at 273 (quoting *Farmer*, 511 U.S. at 842).

## B.

In a prior order, the Court deferred and carried the issue of qualified immunity following motions to dismiss filed by certain Defendants.  Docket No. 41.  With respect to nurse Green, the complaint had sufficiently alleged Green was "subjectively aware of a substantial risk of harm to Newsome's health" and yet was deliberately indifferent because he allegedly did "almost nothing."  Docket No. 41 at 13.  The Court also concluded that the allegations about Sheriff Taylor were sufficient to support a claim that Taylor adopted and implemented two policies that he knew or should have known would result in the violation of detainees' constitutional rights.  *Id.* at 14–15.  The Court deferred and carried Defendants' motions to dismiss because "there remain[ed] significant questions to be answered as to the details of the Defendants' knowledge, actions, omissions, and/or policies," particularly whether Defendants acted with deliberate indifference.  *Id.* at 17–18 (quoting *Webb v. Livingston*, 2014 WL 1049983, *8 (E.D. Tex. Mar. 17, 2014)).  The Court then permitted discovery on the issue of qualified immunity.  *Id.* at 19.

Defendants now move for summary judgment, arguing that they are entitled to qualified immunity as a matter of law because Newsome's constitutional rights were not violated.  Defendants contend that there is no evidence to support the

allegations of deliberate indifference, and in fact the evidence establishes that Defendants provided Newsome with medical care throughout her detention.

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. PRO. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A fact is material only if it will affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine only if the evidence could lead a reasonable jury to find for the nonmoving party. *See id.* In determining whether a genuine issue of material fact exists, the Court views all inferences drawn from the factual record in the light most favorable to the nonmoving party, here Plaintiffs. *Id.*; *Matsushita*, 475 U.S. at 587. Plaintiffs must do more than make conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation, but must assert competent summary judgment evidence to create a genuine fact issue. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994); *Matsushita*, 475 U.S. at 586. Summary judgment must be granted if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23.

When a government official moves for summary judgment on a qualified immunity defense, the plaintiff bears the burden to show the defendant is not entitled

to the defense.  *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021).  This "alters the usual summary judgment burden of proof."  *Id.* (quoting *Valderas*, 937 F.3d at 389).  To meet its burden, "the plaintiff need not present absolute proof, but must offer more than mere allegations."  *Valderas*, 937 F.3d at 389 (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (cleaned up)); *see also Brown v. Callahan*, 623 F.3d 249, 252-53 (5th Cir. 2010) ("The plaintiff bears the burden of negating qualified immunity, [] but all inferences are drawn in his favor.").  Neither "mere denial of material facts nor . . . unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry Plaintiffs' burden to prove a genuine dispute of material fact.  *Jones v. Shivers*, 2016 WL 11472333, at *4 (E.D. Tex. July 15, 2016) (citing *Moayedi v. Compaq Comput. Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004)).  "An officer is entitled to qualified immunity if the officer's conduct either did not violate a federal right of the plaintiff or that right was not clearly established at the time of the relevant events."  *Batyukova*, 994 F.3d at 724–25.

## IV.

As explained below, the Court concludes that Defendants are entitled to qualified immunity because Plaintiffs have failed to offer evidence that Defendants violated Newsome's constitutional rights.  Rather, when viewed in the light most favorable to Plaintiffs, the evidence demonstrates that Defendants provided medical care for Newsome throughout her detention, made her prescription medications available as needed, repeatedly requested Newsome's medical history from private

providers, and had no reason to believe that Newsome faced a substantial risk of serious harm before she was found unconscious at 5:00 p.m. on June 15.

During the twenty-four-hour period leading up to Newsome's death, Defendants examined and monitored Newsome as they attempted to determine the cause of her symptoms.  It is uncontroverted, for example, that Green personally examined Newsome twice during this period, offered to send her to the hospital (which she declined), drew a blood sample for lab analysis, administered a variety of medications, and instructed jail staff to call for an ambulance when Newsome's condition worsened.  Although other medical professionals might disagree with this approach, it is not deliberate indifference.  *See, e.g.*, *Rombach v. Culpepper*, 2021 WL 2944809, at *4 (5th Cir. July 13, 2021) (unpublished).

Below the Court examines the claims against each Defendant in turn.  *See Dyer v. Houston*, 964 F.3d 374, 382 n.6 (5th Cir. 2020) ("We recognize the settled rule that, in assessing qualified immunity, a court must 'consider the conduct of each officer independently,' not 'collectively.'") (citations omitted); *Spikes v. McVea*, 2021 WL 4167215, at *1 (5th Cir. Sept. 14, 2021) (same).

## A. DEFENDANT TAYLOR

Plaintiffs do not allege that Anderson County Sheriff Greg Taylor was personally involved in Newsome's treatment, but rather that he violated her constitutional rights by failing to train and supervise jail staff and by implementing two policies restricting emergency medical treatment for detainees.  Docket No. 51

¶¶ 9, 92–105.[6]  Taylor—the chief policymaker of the Anderson County Jail during the relevant period, *see* Docket No. 210, Ex. H at 2— argues that he implemented a robust training program, there is no evidence of the claimed policies, and the County's true policy is to provide emergency medical care to detainees without regard to cost or authorization.  Taylor thus claims qualified immunity because he did not violate Newsome's constitutional rights.  *See* Docket No. 210.

A supervisor like Sheriff Taylor may be liable for violating a detainee's constitutional rights if (1) he implemented an unconstitutional policy or failed to train or supervise jail staff, *see, e.g.*, *Grant v. LeBlanc*, No. 21-30230, 2022 WL 301546, at *5 (5th Cir. Feb. 1, 2022); *Hicks v. LeBlanc*, 832 F. App'x 836, 841 (5th Cir. 2020); (2) there is a causal connection between the unconstitutional policy or the failure to train or supervise and the constitutional injury, *see, e.g.*, *Thompson*, 245 F.3d at 459; *Peña v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018); and (3) implementing the policy or failing to train or supervise constituted deliberate indifference to the detainee's constitutional rights by "disregard[ing] a known or obvious consequence of his action."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see, e.g.*, *Thompson*, 245 F.3d at 459; *Peña*, 879 F.3d at 620; *Porter*, 659 F.3d at 446.

Here, Plaintiffs have presented no evidence to support liability against Sheriff Taylor.

---

[6]  Plaintiffs sued Taylor in both his official and individual capacities.  Docket No. 51 ¶ 9, 92–105.  Only the individual-capacity claim is at issue here because the official-capacity claim is not subject to the defense of qualified immunity.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Burge v. Parish of St. Tammany*, 187 F.3d 425, 466 (5th Cir. 1999).

1.  **Failure to train or supervise.**  Plaintiffs claim that Taylor failed to provide sufficient staff training to care for detainees like Newsome and that he knew "of the substandard medical care" being provided to detainees and failed to address it.  *Id.* ¶¶ 95, 110.  But "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Walker v. Upshaw*, 515 F. App'x 334, 340 (5th Cir. 2013); *see also Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) (supervisory liability claims based on inadequate training require plaintiffs to "allege with specificity how a particular training program is defective"); *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992) (granting summary judgment for sheriff on failure-to-train claim in part because plaintiff "never described the training that the deputies allegedly lacked that was necessary for adequate job performance").  And here, Plaintiffs cite no evidence to support their allegations.  Plaintiffs claim that one detainee died at the jail fourteen months before Newsome's death, but they provide no evidence to substantiate the claim.  *See Brown v. Callahan*, 623 F.3d 249, 257 (5th Cir. 2010) (holding that sheriff was entitled to qualified immunity and that without "prior incidents that connoted inadequate medical care at the jail, it is impossible to infer that the Sheriff was essentially callous about inmate medical care or had any reason to suspect the level of care had become or could become constitutionally inadequate"); s*ee also Languirand v. Hayden*, 717 F.2d 220, 229 (5th Cir. 1983) (reversing a jury verdict rendered under a failure-to-train theory where there was no evidence of prior incidents of police misconduct to support a finding that policymakers were "consciously indifferent" to constitutional rights).

Rather, the evidence demonstrates the opposite—that Sheriff Taylor had implemented a program to train jail staff to monitor and treat inmates with medical conditions. The program is set forth in a written document entitled "the Health Services Plan" and is "taught to Jail employees through the Jail's Field Training Program." Docket No. 210, Ex. H at 4. The Plan's stated objective "is to provide medical, dental, and mental health services for inmates on a twenty-four hour a day basis." Docket No. 209, Ex. N at AC0500. The Plan requires, among other things, a "medical/mental health screening [to be] performed by trained booking officers upon entry into the jail," documentation by the nurse of "[a]ny information requiring medical/dental/mental health assistance," the opportunity for detainees to "be seen by the facility nurse" upon request at least once weekly, with "[m]edical and mental health services" available "on an emergency basis at any hour, day or night," and examinations and treatments "performed in a dignified manner and appropriate place." *Id.* at AC0500–01. Both Sheriff Taylor and Captain Todd Choate also signed a "Health Services Plan Addendum" in January 2018 requiring a "qualified medical professional [to] review as soon as possible any prescription medications an inmate is taking when the inmate is taken into custody." *Id.* at AC0502. And both Sheriff Taylor and Captain Choate confirmed by affidavit that "[i]t is the policy, custom and practice of the Anderson County Jail that any staff member who observes a detainee or inmate that they believe is having an emergency medical issue, is to call Emergency Medical Services and/or 9-1-1 without awaiting approval to do so." *Id.*, Ex. H at 4; *id.*, Ex. A at 4.

25

Plaintiffs cite nothing to the contrary.  They therefore cannot establish a failure-to-train-or-supervise claim.  *See, e.g.*, *Goodman v. Harris County*, 571 F.3d 388, 396 (5th Cir. 2009) (dismissing failure-to-train-or-supervise claim because plaintiff "ha[d] not shown that [the official] acted with deliberate indifference" and "point[ed] to no pattern of violations or deficiencies in the training program"); *Roberts*, 397 F.3d at 293 (dismissing failure-to-train-or-supervise claim because "plaintiffs have failed to create a fact issue concerning whether [the police chief] offered insufficient or inadequate training" and police chief "supplied overwhelming evidence that his officers . . . were adequately trained," which indicated that the department had a "comprehensive policy [on the use of deadly force]" and that "all officers undergo [relevant] training"); *Young v. Akal*, 985 F. Supp. 2d 785, 806 (W.D. La. 2013) (dismissing failure-to-train-or-supervise claim because plaintiffs "put forth no evidence controverting the evidence of training" and "failed to introduce any evidence to suggest the manner in which such training and procedures were inadequate").

**2.  Permission-to-contact-EMS policy.**  Plaintiffs also claim that Sheriff Taylor implemented an unwritten policy prohibiting jail staff below the rank of sergeant from contacting emergency medical services without permission from medical staff—and that staff were directed to "sparingly grant" such permission. Docket No. 51 ¶¶ 92–93.  The only evidence of this policy, however, is a single statement from jailer Alicia Wilson, who testified that she "wasn't able . . . to call 911" because she "wasn't a sergeant, just a regular jailer."  Docket No. 218, Ex. O at 10. Wilson's testimony does not show that this was a policy implemented by Taylor, and

the other jailers testified that no such policy existed.  *See* Docket No. 210 at 10; *see also id.*, Ex. A. at 4; *id.*, Ex. B at 4; *id.*, Ex. D at 33; *id.*, Ex. E at 3; *id.*, Ex. F at 12, 21; *id.*, Ex. G at 2–3; *id.*, Ex. H at 4; Docket No. 208, Ex. J at 16; Docket No. 209, Ex. A at 19.  But even assuming the policy's existence, the Court finds no evidence of a causal connection between the policy and Newsome's death or evidence that Sheriff Taylor implemented it with deliberate indifference.  Here, Matthew Wickersham discovered Newsome and called EMS after first calling nurse Green, but Wickersham was a sergeant and therefore would not have needed permission from Green under the alleged policy.  Docket No. 210, Ex. E at 2–3.

Plaintiffs, moreover, cite no evidence that Sheriff Taylor acted with deliberate indifference in implementing the alleged EMS policy.  "[D]emonstrating that a policy reflects deliberate indifference 'generally requires that a plaintiff demonstrate at least a pattern of similar violations.'"  *Walker*, 515 F. App'x at 341 (citations omitted).  Indeed, the Fifth Circuit has "stressed that a single incident is usually insufficient to demonstrate deliberate indifference."  *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).  Yet, Plaintiffs do not allege even a single instance in which a jailer's request to call EMS was ever denied—much less a pattern of denials resulting in harm.  This "fail[ure] to identify any prior constitutional violations resulting from [the supervisor's] policies . . . falls short of the standard required" to show a policy maintained with objective deliberate indifference to its obvious consequences.  *Walker*, 515 F. App'x at 341.

**3. Personal-recognizance-bond policy.**  Plaintiffs also argue that Sheriff Taylor implemented a policy requiring staff to secure a personal recognizance bond when detainees needed to go to the hospital, which allegedly delayed treatment. Docket No. 214 at 12–13; Docket No. 218 at 15, 22–24.  Plaintiffs, however, made this allegation for the first time in response to Defendants' motions for summary judgment.  Docket No. 214 at 12–13, 21; Docket No. 218 at 15, 22–24.  And "a claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."  *Jackson v. Gautreaux*, 3 F.4th 182, 188 (5th Cir. 2021).  The claim fails for this reason alone.

Even if the argument were properly raised, moreover, Plaintiffs fail to show that the policy caused Newsome's death or that Sheriff Taylor implemented the policy with deliberate indifference.  There is no evidence, for example, that Defendants attempted to send Newsome to the hospital but delayed in order to obtain a PR bond for her.  In fact, the evidence shows that Captain Choate attempted to secure a PR bond for Newsome on June 15 because "I thought Ms. Newsome may have caught the stomach bug," and release on bond "would give Ms. Newsome the opportunity to seek medical attention from her personal doctors and to rest comfortably at her home instead of at the Jail."  Docket No. 210, Ex. A at 3–4.  Choate testified that "[a]t no time during my conversations about a Personal Recognizance Bond did I ever believe Ms. Newsome was having an emergency medical issue."  *Id*.[7]

---

[7] One reason Choate was unable to secure a release on bond for Newsome is because her family, including Plaintiffs, objected to her release.  Docket No. 210 at 5; *id.*, Ex. C at 2.  *See also* Docket No. 209, Ex. G at 29, 34 (Plaintiff Amber Ford testifying that, "at the time I thought that [Newsome]

Nor is there evidence of deliberate indifference. Plaintiffs cite no prior incidents of the alleged policy harming detainees—and thus nothing that could demonstrate "a pattern of similar violations." *Walker*, 515 F. App'x at 341. And Plaintiffs fail to satisfy the "extremely narrow" single-incident exception by demonstrating that the "highly predictable consequence" of the policy "would result in the specific injury suffered." *Hutcheson v. Dallas County*, 994 F.3d 477, 482 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 564 (2021) (citation omitted); *Anderson v. Marshall County*, 637 F. App'x 127, 134 (5th Cir. 2016).

Accordingly, Plaintiffs have failed to establish that Sheriff Taylor violated Newsome's constitutional rights. He is therefore entitled to qualified immunity, and the Court **GRANTS** Taylor's motion for summary judgment in his individual capacity.

## B. JAILER DEFENDANTS

Plaintiffs allege that the eight Jailer Defendants violated Newsome's constitutional rights by "failing to provide for [her] transport . . . to an appropriate medical facility or health care provider for further medical evaluation and/or treatment." Docket No. 51 ¶¶ 126–27. Plaintiffs also argue in response to

---

being in jail was the best thing for her," and that "I wanted [Newsome] to be in jail because the drug use was obviously becoming a thing and I thought that going through this process would wake her up"); *id.*, Ex. H at 15, 17, 23 (Plaintiff Regan Kimbrough testifying that he "believe[d] that [Newsome] needed to stay in [jail] until she got healthy," that "if [Newsome] stayed in [jail] this would probably frighten her, maybe make her realize that she needs to get off any drugs or abuse of any medications and come out, be a better person," and that he was willing to let Newsome stay in jail for "[h]owever long it took for her to get better"); *id.*, Ex. I at 24, 27, 31 (Plaintiff Ann Newsome testifying that she did "[n]ot really" want Newsome out of jail but "wanted [Newsome] to straighten up," that they "talked about [posting bond for Newsome], but I told [Newsome] I didn't think that was a good idea," and that "I chose not to [post bond for Newsome] because I didn't feel like she needed to be out").

Defendants' motion for summary judgment that Carpenter, Hughes, Jones, Strong, Wesson, Wickersham, and Wilson ignored Newsome's cries for help and inadequately monitored her, Docket No. 218 at 12–14, Wickersham failed to immediately call EMS upon finding Newsome unresponsive, *id.* at 14–15, and Choate delayed Newsome's hospitalization by seeking a PR bond, *id.* at 15.  The Jailer Defendants counter that they appropriately monitored Newsome and never treated her with deliberate indifference.  Docket No. 210 at 23–24.  Defendants thus claim qualified immunity because they did not violate Newsome's constitutional rights.  *See id.*

As stated above, to overcome qualified immunity here, Plaintiffs must show that the Jailer Defendants had "subjective knowledge of a substantial risk of serious harm to [Newsome] and responded to that risk with deliberate indifference." *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996).  Proving "[n]egligence or even gross negligence is not enough."  *Campos v. Webb County*, 597 F. App'x 787, 792 (5th Cir. 2015).  Rather, "[d]eliberate indifference is shown when the official knows of and disregards an excessive risk to inmate health or safety," and when the official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw[s] the inference." *Estate of Henson v. Krajca*, 440 F. App'x 341 343 (5th Cir. 2011); *see also Rombach*, 2021 WL 2944809, at *4 (holding that showing a constitutional violation under qualified immunity requires an "objective exposure to a substantial risk of serious harm," an official's awareness of "facts from which the inference [of that harm's existence] could be drawn," the

official actually "draw[ing] the inference," and the official "disregard[ing] that risk by failing to take reasonable measures to abate it").

Plaintiffs, however, have presented no evidence that the Jailer Defendants were aware of a substantial risk to Newsome's health or acted with deliberate indifference.  In fact, the evidence demonstrates the opposite—that in the hours leading up to Newsome's death, the Jailer Defendants closely monitored Newsome, saw nothing to indicate she was in serious medical distress, and called for medical help as soon as her condition worsened.  It is undisputed, for example, that jail staff checked on Newsome a total of thirty-one times between 11:59 p.m. on June 14 and 5:04 p.m. on June 15, or about once every half hour on average.  Docket No. 218 at 14.  During their interactions with Newsome during that period, Defendants attest that she was "alert and able to communicate clearly" and could "walk with a little bit of assistance," although she did have to make use of a wheelchair at times.  Docket No. 210, Ex. B. at 2; *id.*, Ex. E at 2.

Plaintiffs argue that "any reasonable jailer" observing Newsome's symptoms and condition would have known that she needed immediate medical treatment.  *See* Docket No. 218 at 23.  But the Jailer Defendants were not medical professionals and uniformly testified that Newsome's symptoms did not appear serious.  Docket No. 210, Ex. B at 2; *id.*, Ex. E at 2; *id.*, Ex. G at 2.  They were also aware that nurse Green had examined Newsome at midnight on June 14 and again the morning of June 15—and that Newsome continued to appear "alert" and was able to get to the toilet with help late in the afternoon on June 15.  *Id.*, Ex. B at 2–3; *id.*, Ex. E at 2; *id.*,

Ex. G at 2.  The Jailer Defendants uniformly claim that they would have immediately called EMS if they believed Newsome needed emergency treatment—and in fact responded to and assisted Newsome when she needed help late on June 15.  Docket No. 210, Ex. B at 2–3; *id.*, Ex. E at 2–3; *id.*, Ex. G at 2; *id.*, Ex. L at 34.  Although in hindsight some of Newsome's symptoms could indicate a more serious condition, "an officer's failure to immediately recognize ambiguous symptoms as a medical emergency does not amount to deliberate indifference." *Trevino v. Hinz*, 751 F. App'x 551, 555 (5th Cir. 2018); *see also Tamez v. Manthey*, 589 F.3d 764, 766, 771 (5th Cir. 2009) (detectives were not deliberately indifferent for not seeking immediate medical treatment for symptomatic detainee even when medical professional advised pre-booking treatment because plaintiffs "d[id] not show that the detectives were aware, or should have been aware, of any substantial risks to [detainee's] health").[8]

In *Trevino*, for example, an arrestee was vomiting violently, shaking, coughing, claiming to have a seizure, and later died.  751 F. App'x at 552–53.  The Fifth Circuit nonetheless held that the officers' failure to seek medical treatment was more akin to "negligence . . . in not initially realizing the gravity of [the arrestee's] condition and in not calling an ambulance sooner."  *Id.* at 554.  The officers testified that they believed the detainee was faking illness to avoid jail, and they observed her "breathing fine and talking with officers."  *Id.* at 553.  When the arrestee began

---

[8] Officials who respond to requests, provide medication, and treat a detainee are generally not acting with deliberate indifference. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (evidence such as "medical records of sick calls, examinations, diagnoses and medications may rebut an inmate's allegations of a prison official's deliberate indifference to the inmate's substantial risk of serious harm").

experiencing "real distress," including foaming at the mouth, moreover, the officers attempted to provide her aid and called EMS. *Id.* The Fifth Circuit explained that the officers were entitled to qualified immunity in part because the detainee's symptoms were ambiguous and did not necessarily indicate a medical emergency, particularly since she could converse with them. *Id.* at 556. *See also Roberts v. Lessard*, 841 F. App'x 691, 695 n.14 (5th Cir. 2021) ("[O]ur prior decisions suggest that an officer's failure to correctly diagnose a medical condition from ambiguous symptoms does not amount to deliberate indifference.") (citing *Trevino*, 751 F. App'x at 555).

Plaintiffs repeatedly assert that the Jailer Defendants ignored "Newsome's cries and screams for help, a doctor, and to go to the hospital." Docket No. 218 at 14. As evidence, Plaintiffs cite the affidavits of three other detainees who were in nearby cells. Two testified that they heard Newsome moaning and asking for a doctor at some point during the night. Docket No. 214, Ex. P; *id.*, Ex. Q. The third testified that she heard Newsome requesting a doctor at some point during the day on June 15. *Id.*, Ex. O. Although one detainee claims that in his view the jailers "seemed to be ignoring" Newsome's moans, *id.*, Ex. Q, Plaintiffs cite no evidence that the Jailer Defendants heard Newsome's cries.

Even if they had heard Newsome, moreover, Defendants' conduct was not deliberately indifferent to a serious medical need under the circumstances here. Nurse Green had examined Newsome multiple times; jailers were monitoring her closely at the nurse's instruction; and Newsome otherwise appeared alert and mobile.

33

In *Rombach*, for example, the Fifth Circuit held that jailers were not deliberately indifferent to the serious medical needs of an inmate who later died, despite testimony from another inmate that the decedent had told jailers "he did not feel well and [that] he wanted to go to the hospital." 2021 WL 2944809, at *5–6. The inmate further declared that "I personally told [several jailers] that [the decedent] did not feel well, was not eating[,] and was vomiting[,] and he needed a doctor." *Id.* "Despite this evidence," the Fifth Circuit concluded, "we are unconvinced that the Plaintiffs have shown that any of these officers was deliberately indifferent to [decedent's] medical needs" where they had monitored the decedent and were unaware of his true condition. *Id.* at *6; *accord. Estate of Allison*, 524 F. App'x at 971 (jailer was not deliberately indifferent to detainee's medical needs, even though he had personal knowledge of possible health problems, where he and other jailers regularly monitored detainee).[9]

---

[9] Plaintiffs also allege, based on a series of letters that Newsome purportedly sent to her mother while detained, that the Jailer Defendants displayed a "total disregard to her medical needs" and that the jail had a "culture [of] ignoring inmate/detainees' serious medical needs." Docket No. 218 at 15, 22 (citing *id.*, Ex. M at 00052–00125). Defendants object to the admission of the letters. Docket No. 225 at 4. The Court agrees with Defendants and **SUSTAINS** the objection. The letters are unsworn and are thus not competent summary judgment evidence. *See, e.g., Cooper v. Upshur County Constable's Off.*, 2008 WL 2035809, at *4 (E.D. Tex. May 12, 2008) ("Unsworn letters, even if signed, are not competent summary judgment evidence."); *see also, e.g., Payne v. City of San Antonio*, 2021 WL 397411, at *11 (W.D. Tex. Feb. 4, 2021), *R. & R. adopted in part, rejected in part on other grounds*, 2021 WL 1398973 (W.D. Tex. Mar. 30, 2021) (rejecting plaintiff's "unsworn letters" as "not proper summary judgment proof" insofar as they were used to "dispute the version of events set forth in Defendants' sworn declarations"); *see also Watts v. Kroger Co.*, 170 F.3d 505, 508 (5th Cir. 1999) (affirming district court's decision that unsworn signed statements from coworkers are not competent summary judgment evidence). Moreover, even if the Court considered the letters, they fail to demonstrate deliberate indifference by any of the Jailer Defendants. In the letters, Newsome complains of periodically running out of her medications, experiencing nerve pain and ear pain, being "denied medical treatment," and receiving lower dosages for pain medication than requested. Docket No. 218, Ex. M at 00052–81. But there is no evidence that any of these alleged complaints contributed to Newsome's death or that any of the jailers were aware of the complaints and believed Newsome to be at "substantial risk of serious harm." *See, e.g., Hare*, 74 F.3d at 650.

Plaintiffs specifically target Sergeant Wickersham and Captain Choate. Plaintiffs claim that on one occasion in April, Wickersham denied Newsome's request for clonazepam,[10] telling her that "[i]f you signed for your meds and didnt [sic] get them [sic] then that is on you.  I can [sic] do anything about your meds."  Docket No. 214, Ex. B at AC0324.  But Plaintiffs cite no evidence that denying Newsome clonazepam in mid-April worsened Newsome's condition or caused her death in June.  *See* Docket No. 220, Ex. C; *id.*, Ex. D.  Nor do they show that Wickersham "knew that [Newsome] had [a specific medical condition], understood the risks [of that medical condition], knew the appropriate level of treatment, [and] was aware that [Newsome] had been denied that level of treatment."  *Sheppard v. Dallas County*, 2008 WL 656889, *1 (N.D. Tex. Mar. 6, 2008).

Plaintiffs also assert that Wickersham acted with deliberate indifference by calling Green before contacting EMS when he found Newsome unresponsive in her cell.   Docket No. 218 at 14–15.   But Wickersham called Green—the medical professional treating Newsome—immediately upon finding Newsome, and then contacted EMS only a few minutes later.  That does not rise to the level of deliberate indifference.  *See Silva v. Moses*, 542 F. App'x 308, 310 (5th Cir. 2013) (no deliberate indifference where detainee suffered extreme pain and permanent blindness after being splashed with acid while waiting 30–45 minutes for ambulance because detainee failed to show that officers "failed to call or delayed calling an ambulance");

---

[10] Clonazepam is a benzodiazepine used to treat panic attacks and seizures.  *See* Nat'l Library of Med., *Clonazepam*, MEDLINEPLUS (May 15, 2021), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html (last visited Mar. 16, 2022); *see also Martin v. Colvin*, 165 F. Supp. 3d 506, 508 n.2 (N.D. Tex. 2016).

*Grafton v. Bailey*, 2018 WL 2325410, at *10–11 (W.D. La. May 22, 2018) (no deliberate indifference where jailer found inmate unresponsive, first called jail nurse, then called EMS approximately four minutes later); *cf. Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (deliberate indifference where officials waited two hours to call EMS after detainee vomited and lost consciousness).   Plaintiffs, moreover, fail to show that Wickersham's calling EMS a few minutes earlier would have prevented Newsome's death.   *See Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (delay of medical care is only a constitutional violation "if there has been deliberate indifference *that results in* substantial harm" (emphasis added) (cleaned up)); *see also Grafton*, 2018 WL 2325410, at *10–11 (holding that "no reasonable jury could find for Plaintiffs on the causation issue" where there was "no evidence" that delaying CPR for the six minutes between when jailer called EMS and when EMS arrived would have saved decedent's life).

Plaintiffs argue that Captain Choate "intentionally delayed" getting Newsome to the hospital because of the "PR Bond policy" despite his "knowledge that Ms. Newsome needed to go to the hospital [and that] she was experiencing a serious medical need."   Docket No. 218 at 22–23; Docket No. 231 at 9.   But as explained above, there is no evidence to support this claim.   *See supra*, part IV.A.3.

Plaintiffs have therefore failed to establish that the Jailer Defendants violated Newsome's constitutional rights.   Further, Plaintiffs have not shown that any of the jailers acted with objective unreasonableness in their treatment of Newsome.   *See, e.g.*, *Trevino*, 751 F. App'x at 556 (concluding that "officers' conduct was not

36

objectively unreasonable in light of clearly established law" despite fact that arrestee "vomited, had several shaking episodes, and told the officers she was sick"). Accordingly, the Jailer Defendants are entitled to qualified immunity, and the Court **GRANTS** the summary judgment motion of Defendants Carpenter, Choate, Hughes, Jones, Strong, Wesson, Wickersham, and Wilson.

### C. Defendant Dr. Corley

Plaintiffs allege that Dr. Corley violated Newsome's constitutional rights by depriving her of necessary medical treatment. Plaintiffs' expert witnesses opine that Dr. Corley failed to identify Newsome's symptoms as an "Addisonian crisis," did not review her medical logs, neglected to obtain her medical records, and never implemented a "documented treatment regimen." Docket No. 220, Ex. C at 2–7; *id.*, Ex. D at 2–8. Dr. Corley argues that he reasonably relied on Green for Newsome's day-to-day care, there is no evidence he personally knew the details of Newsome's symptoms in her final days, and a disagreement over medical treatment is not deliberate indifference. Dr. Corley thus claims qualified immunity because he did not violate Newsome's constitutional rights.

### 1.

A threshold issue is whether Dr. Corley—who is not an Anderson County employee—may assert qualified immunity.

"Whether private actors may assert qualified immunity depends on '(1) principles of tort immunities and defenses applicable at common law around the time of § 1983's enactment in 1871 and (2) the purposes served by granting immunity.'" *Sanchez v. Oliver*, 995 F.3d 461, 466 (5th Cir. 2021) (quoting *Perniciaro*

*v. Lea*, 901 F.3d 241, 251 (5th Cir. 2018)).  "The purposes of qualified immunity identified by the Supreme Court are '(1) preventing unwarranted timidity in the exercise of official duties; (2) ensuring that highly skilled and qualified candidates are not deterred from public service by the threat of liability; and (3) protecting public employees—and their work—from all of the distraction that litigation entails.'" *Id.* (quoting *Perniciaro*, 901 F.3d at 251 (citing *Richardson v. McKnight*, 521 U.S. 399, 407–12 (1997) and *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012))).  "Of these, preventing unwarranted timidity is most important." *Id.* at 467 (citing *Richardson*, 521 U.S. at 409).

In *Perniciaro*, the Fifth Circuit held that "general principles of immunity at common law" in 1871 supported the right of two privately employed psychiatrists to assert qualified immunity where they "work[ed] in a public institution and alongside government employees . . . [and] their public counterparts would be entitled to assert qualified immunity." 901 F.3d at 252.  The court relied on *Filarsky*, in which the Supreme Court permitted a private attorney to assert qualified immunity because he was an individual engaged in public service on a temporary basis—similar to numerous individuals who received immunity under the common law. *Id.*  In *Sanchez*, however, the Fifth Circuit clarified that a private mental health professional may *not* assert qualified immunity where her employer was "systematically organized to perform the major administrative task of providing mental-health care at state facilities." 995 F.3d at 467.  An "in-depth historical survey of the common law in the late nineteenth century . . . found . . . examples of individuals

receiving immunity for actions taken while engaged in public service on a temporary or occasional basis." *Id*. at 468 (citing *Filarsky*, 566 U.S. at 388–89). But there was no such tradition of "making the qualified immunity defense available to a mental healthcare provider employed by a large, for-profit company contracted by a government entity to provide care in a correctional setting." *Id*. at 469.

The *Perniciaro* court further held that the "purposes of qualified immunity also weigh in favor of permitting [the psychiatrists] to seek its protection." 901 F.3d at 253–55. First, immunity was necessary to prevent "unwarranted timidity" because the psychiatrists did not work for a large prison-management firm, they reported to a state employee rather than a private employer, and there was no evidence that other providers were vying for the government contract. *See id*. at 253–54. "Under these circumstances, it is unlikely that, absent immunity, market forces would swiftly intervene to discipline overly timid performance." *Id*. at 254. Second, immunity would ensure that the threat of litigation does not deter talented candidates like the psychiatrists, who are "highly skilled individuals" with the "freedom to select other opportunities that carry less risk of liability," from accepting public service. *Id*. And third, immunity would protect the psychiatrists and their public-employee coworkers from the distraction of litigation. *See id*. at 254–55.

Applying that law here, the Court holds that Dr. Corley may assert qualified immunity. Dr. Corley was a self-employed physician retained by the County to perform medical services at the jail for $1,500 per month. Docket No. 238 at 2; *id.*, Ex. A at 00077–78. He was thus "an individual retained, as an individual, to perform

discrete government tasks" and falls within the long line of "individuals receiving immunity for actions taken while engaged in public service on a temporary or occasional basis." *Sanchez*, 995 F.3d at 468 (quoting *Filarsky*, 566 U.S. at 388–89). Like the attorney in *Filarsky* and the psychiatrists in *Perniciaro*, moreover, Dr. Corley did not work for an employer "systematically organized to perform a major administrative task for profit." Docket No. 238 at 2 (citing Docket No. 220, Ex. J at 7). The *Sanchez* court's holding does not apply here. *See* 995 F.3d at 469. Accordingly, the same general principles of immunity at common law cited in *Filarsky* and *Perniciaro* support Dr. Corley's assertion of qualified immunity.

The purposes of qualified immunity also weigh in favor of permitting Dr. Corley to seek its protection. As in *Perniciaro*, granting Dr. Corley immunity would prevent unwarranted timidity because he did not work for a large for-profit firm, he reported to Anderson County rather than a private employer, and there were no other providers vying for the County work. Docket No. 238 at 2, 4 (citing Docket No. 220, Ex. J at 7); *Perniciaro*, 901 F.3d at 253–54. Market forces are thus insufficient to provide Dr. Corley with an incentive to avoid timidity in the care of jail detainees. *See Perniciaro*, 901 F.3d at 254. Immunity would also ensure that the threat of litigation does not deter talented and highly skilled individuals like Dr. Corley from accepting public service. *See id.* at 254. And immunity would protect Dr. Corley, as well as nurse Green and the other jail employees, from the distraction of litigation. *See id.* at 254–55.

Accordingly, Dr. Corley may assert the defense of qualified immunity.

**2.**

Having determined that Dr. Corley may assert qualified immunity, the Court must next decide whether he is entitled to its protection.

As explained above, Dr. Corley is protected with immunity unless he violated Newsome's clearly established constitutional rights and his conduct was objectively unreasonable in light of clearly established law.  *See, e.g.*, *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019).  Here, that means Plaintiffs must show that Dr. Corley had "subjective knowledge of a substantial risk of serious harm to [Newsome] and responded to that risk with deliberate indifference."  *Hare*, 74 F.3d at 650.  To prove deliberate indifference, Plaintiffs must present evidence that Dr. Corley was aware of facts from which an inference of substantial risk of serious harm could be drawn, he actually drew the inference, and he disregarded that risk of harm.  *Perniciaro*, 901 F.3d at 257 (citations omitted).  Negligence is insufficient.  *See Campos*, 597 F. App'x at 792; *see also, e.g.*, *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not.").

Plaintiffs have presented no evidence that Dr. Corley was deliberately indifferent to Newsome's serious medical needs.  Plaintiffs' experts criticize Dr. Corley for failing to obtain Newsome's medical records, neglecting to implement a written treatment plan, and failing to recognize Newsome's symptoms as presenting a medical crisis when he examined her on May 11.  Docket No. 220, Ex. C at 2–7; *id.*, Ex. D at 2–8.  Even if true, this is not deliberate indifference.  *See, e.g.*, *Stewart*, 174 F.3d at 535–36 (no deliberate indifference where doctor failed to read nurses' notes

on a patient's condition, failed to note a large ulcer, failed to prescribe or administer any antibiotics, and failed to follow up to ensure that his orders were carried out, resulting in patient's death from sepsis caused by ulcer); *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019) ("[D]isagreement about the recommended medical treatment is generally not sufficient to show deliberate indifference."); *Gonzales v. Isbell*, 456 F. App'x 466, 467 (5th Cir. 2012) (detainee's claim "regarding the ineffectiveness of his pain medication exhibits merely a disagreement about his medical treatment, which is insufficient to raise a genuine dispute as to a material fact on a claim of deliberate indifference"); *Adams v. Nolen*, 2009 WL 57105, at *4 (E.D. Tex. Jan. 2, 2009) ("[T]he fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs.").

The uncontroverted evidence, moreover, shows that Dr. Corley requested Newsome's records, implemented either a written or oral treatment plan with Green, and personally examined Newsome on May 11, documenting her condition and her chronic illnesses and prescribing medication to treat her symptoms.  Docket No. 209, Ex. A at 26–27, 58–60; *Id.*, Ex. N at AC0388–89.  As one court summarized, "[i]t has been consistently held that an inmate who has been examined by medical personnel fails to set forth a valid showing of deliberate indifference to serious medical needs." *Gillis v. Goodwin*, 2015 WL 3622675, at *3 (W.D. La. June 9, 2015).

Plaintiffs also complain that Dr. Corley personally examined Newsome only once during her detention and prescribed her various medications without an

examination.  But Green, the nurse reporting to Dr. Corley, examined Newsome on numerous occasions.  Docket No. 209, Ex. N at AC0374–77, 0393–94; Docket No. 218, Ex. B at 129, 133; *see also Gobert*, 463 F.3d at 350 n.35 ("Continuous personal treatment by the defendant physician is not constitutionally mandated."); *Perniciaro*, 901 F.3d at 259 ("Delegation to a [medical professional] trained to address a patient's medical needs does not evince the kind of wanton disregard necessary to establish deliberate indifference.").   And prescribing medication without a physician examination is not deliberate indifference.  *See Snell v. Cmty. Educ. Centers Corr. & Med. Staff*, 2012 WL 3956328, at *10 (E.D. Tex. June 20, 2012), *R. & R. adopted*, 2012 WL 3930062 (E.D. Tex. Sept. 10, 2012) ("[T]he prescribing of treatment for pain without a personal examination is [not] tantamount to deliberate indifference to serious medical needs."); *Cook v. Fitts*, 2008 WL 4104429, at *4 (S.D. Tex. Aug. 30, 2008) (same); *see also Davenport v. Tanner*, 2015 WL 8478344, at *4 (E.D. La. Dec. 10, 2015) (no deliberate indifference where doctor personally examined inmate only once during two-month period).  Indeed, the Fifth Circuit has held that abruptly discontinuing medication without a thorough examination of the patient or his records constitutes a "disagreement with medical treatment rather than a cognizable claim of deliberate indifference."  *Kirby v. Johnson*, 243 F. App'x 877, 879 (5th Cir. 2007).

At best, Plaintiffs have presented some evidence that additional or different treatment may have prevented Newsome's death, *see* Docket No. 220, Ex. C; *id.*, Ex. D, but that does not rise to the level of deliberate indifference to a substantial

risk of serious harm.  *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) ("[A]n incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.").  Without a showing of deliberate indifference, Plaintiffs have not demonstrated that Dr. Corley violated Newsome's constitutional rights—and certainly have not shown that his conduct was objectively unreasonable in light of clearly established law.  *Perniciaro*, 901 F.3d at 257–59 (holding that physician's "conduct was objectively reasonable in light of clearly established law" where physician treated detainee despite evidence that other treatments should have been tried and despite detainee's complaint that physician failed to create holistic treatment plan); *McCasland v. Upshur County*, 2021 WL 4172933, at *8 (E.D. Tex. Aug. 3, 2021), *appeal dismissed*, 2021 WL 7451384 (5th Cir. Oct. 7, 2021) (holding that jailer certified as paramedic was "not objectively unreasonable in light of the deliberate indifference standard" where detainee "t[ook] issue with the level of care he received" despite detainee attempting suicide).

Dr. Corley is therefore entitled to qualified immunity, and his motion for summary judgment is **GRANTED**.

### D. DEFENDANT GREEN

Plaintiffs allege that Green violated Newsome's constitutional rights by failing to prevent her death, providing inadequate medical treatment, and failing to transport her to a medical facility after learning of her "critical values" on the morning of June 15.  Docket No. 51 ¶¶ 76, 119–123.  The Court previously held that the allegations against Green sufficiently stated that he was "subjectively aware of a substantial risk of harm to Newsome's health" and yet was deliberately indifferent

because he allegedly did "almost nothing."  Docket No. 41 at 13.  Green now moves

for summary judgment and argues that he provided "significant medical care to Ms.

Newsome on multiple occasions and examined and treated Newsome whenever she

requested medical services" and that there is no evidence he subjectively knew of a

substantial risk of serious harm to Newsome.  Docket No. 209.  Green thus argues

that he is entitled to qualified immunity because he did not violate Newsome's

constitutional rights.  *Id.*[11]

As with the other Defendants, to demonstrate a constitutional violation by

Green, Plaintiffs must present evidence that Green (1) was "aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists";

(2) actually "dr[e]w the inference"; and (3) "disregard[ed] an excessive risk to

[Newsome's] health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also*

*Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019); *Garza v. City of Donna*, 922 F.3d

626, 635 (5th Cir. 2019); *Hare*, 74 F.3d at 650.  Failing to recognize the cause of

ambiguous symptoms or providing negligent care, moreover, is not deliberate

indifference.  *See Domino*, 239 F.3d at 756; *Campos*, 597 F. App'x at 792; *see also*

---

[11] Plaintiffs do not challenge Green's assertion of qualified immunity as a part-time employee of the County and have thus waived any argument that he is not entitled to qualified immunity on this basis.  *See e.g.*, *Aldrup v. Caldera*, 274 F.3d 282, 288 (5th Cir. 2001) (failure to raise argument in response to summary judgment motion results in waiver); *Vaughner v. Pulito*, 804 F.2d 873, 877 n.2 (5th Cir. 1986) (same).  Even if Plaintiffs had objected, moreover, the Court would have concluded that Green, like Dr. Corley, may assert qualified immunity here.  Green is an individual medical provider for whom the "general principles of immunity at common law" support qualified immunity. *Perniciaro*, 901 F.3d at 252.  As with Dr. Corley, moreover, the "purposes of qualified immunity" weigh in Green's favor.  *Id.* at 253–55.  Green is not employed by a "large, for-profit company," and there are no market forces preventing "unwarranted timidity" in his practice unless he has immunity.  *Id.* at 253–54.  Immunity would ensure that the threat of litigation does not deter other trained nurses like Green from accepting public service.  *Id.* at 254.  And finally, immunity would protect Green and other jail employees from being distracted by litigation.  *Id.* at 254–55.

*Stewart*, 174 F.3d at 534 ("malpractice or negligent care" is not deliberate indifference).

Plaintiffs' allegations against Green center on Newsome's final days. Plaintiffs allege that Green was "aware of Ms. Newsome's serious medical condition days in advance of her death" and "was aware for over six hours that Ms. Newsome's condition had deteriorated to life threatening," including that she was "vomiting blood" and in "excruciating pain," and that Green nonetheless "deliberately ignored her condition." Docket No. 51 ¶¶ 55, 94. Further, on the day of Newsome's death, Green allegedly knew as early as 10:39 a.m. that Newsome was suffering kidney, heart, and liver failure based on a lab report. *Id.* ¶¶ 60, 76, 79. And yet, Plaintiffs contend, Green refused to send Newsome to the hospital and instead instructed jail staff over the phone merely to give her a laxative. *Id.* ¶ 55.

But the evidence does not support these allegations. Rather, the uncontroverted evidence shows that Green had been closely monitoring and treating Newsome for weeks. On March 11, the day after Newsome was booked into the jail, Green personally examined her and developed a treatment plan in consultation with Dr. Corley. Docket No. 209, Ex. N at AC0394. As part of the plan, Green continued administering Newsome's medications and requested her prior medical records. Docket No. 209, Ex. A at 26. From March 11 to June 15, Green kept a "very open line of communication" with Newsome regarding her medical needs, treating her when she requested and personally examining her on at least five occasions. *Id.* at 58–60, 106, 109, 115; *id.*, Ex. N at AC0374–75, 390–94; Docket No. 218, Ex. B at 121.

46

On the night of June 14, moreover, the evidence shows that Green had no reason to believe Newsome faced substantial risk of serious harm—or that he responded with deliberate indifference. After Newsome complained of "some mild nausea and some vomiting," Green personally examined her that evening and noted that Newsome was "talking, alert, oriented." *Id.* at 120. There is no evidence Newsome was "vomiting blood" and "in excruciating pain," as Plaintiffs allege. Although Green did not believe Newsome was in danger, he offered to send her to the hospital. *Id.* at 61, 122. Newsome declined. *Id.* at 123. Green administered saline and Phenergan and instructed the jail staff to place Newsome on medical watch through the night. *Id.* at 35, 58–60; Ex. N at AC0393. Green later spoke to staff by phone around 2:00 a.m. and approved Newsome's request for a shower. Docket No. 218, Ex. B at 116. Another detainee testified that she heard an officer announce a low-blood-pressure reading from Newsome after her shower, but there is no evidence anyone notified Green of that information. Docket No. 218, Ex. I. Although another medical professional might disagree with Green's treatment of Newsome on the night of June 14, his conduct is not deliberate indifference. *See, e.g.*, *Petzold*, 946 F.3d at 249; *Gonzales*, 456 F. App'x at 467.

Further, the evidence does not demonstrate that Green was aware of a substantial risk to Newsome's life to which he responded with deliberate indifference on June 15. That morning, Green again personally checked on Newsome at the jail. Docket No. 209, Ex. A at 21; *id.*, Ex. N at AC0390; Docket No. 218, Ex. B at 121. She was awake and talking, complained of "mild nausea," and "said she had thrown up

maybe once." Docket No. 209, Ex. A at 122.  Green took a blood sample for testing, treated her with Phenergan and Tylenol #4, delivered the sample to the lab at Palestine Regional Medical Center, and then went to a jail in a neighboring county. *Id.*, Ex. N at AC0390; *id.*, Ex. J at 11; Docket No. 214, Ex. L, P-1 at 4:24.  The parties dispute when Green received the lab results.  The lab technician testified that he "notified" Green by phone at 10:39 a.m. about "critical values" from the report.  Docket No. 209, Ex. A at 41–42; *id.*, Ex. J at 13–16.  The technician did not recall the specifics of the conversation and stated that he could not testify "as to what Green might have actually subjectively heard."  *Id.*, Ex. J at 18.  Green repeatedly testified that he does not remember receiving any critical values at 10:39 a.m. but acknowledged that the technician possibly read them over the phone.   Docket No. 214, Ex. L, P-5 at 1:34–8:32.  There is no evidence, however, that Green put two and two together— that he subjectively knew that the "critical values" meant Newsome faced a substantial risk of serious harm at that moment.  *Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*") (emphasis added).  Plaintiffs cite a physician's opinion that the "critical values" showed Newsome was "in a serious condition needing emergency intervention," Docket No. 220, Ex. C at 5, but expert opinion is not evidence of a defendant's "actual knowledge."  *Williams v. Hampton*, 797 F.3d 276, 292 (5th Cir. 2015).

Even if Green actually knew at 10:39 a.m. that the critical values indicated a serious condition, moreover, Green's response does not constitute deliberate

indifference.  Plaintiffs must show that based on the critical values, Green "refused to treat [Newsome], ignored [her] complaints, intentionally treated [her] incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Krajca*, 440 F. App'x at 345 (quoting *Domino*, 239 F.3d at 756).  The evidence, however, shows that Green had been extensively treating Newsome, personally observed and treated her that morning, and instructed jail staff to monitor her.  Docket No. 209, Ex. A at 21, 26, 35, 58–60, 109; *id.*, Ex. N at AC0374–75, 377, 390, 393–94; Docket No. 218, Ex. B at 121.  No one had reported that Newsome's condition changed or worsened.  Plaintiffs cite Green's testimony that he would have called Dr. Corley if he had known of the critical values as evidence that Green knew the values were dangerous.  Docket No. 214 at 11 (citing Docket No. 209, Ex. A at 41–43, 133).  Although this testimony might indicate Green did not do what he "considered appropriate under the circumstances," it is not evidence of deliberate indifference.  *Krajca*, 440 F. App'x at 346.  "If deliberate indifference could be inferred solely from Nurse [Green's] failure to act in a manner consistent with [his] training, 'the standard applied would be more akin to negligence than deliberate indifference.'"  *Id.* (quoting *Hare*, 74 F.3d at 649).

This case is similar to *Krajca*, in which the Fifth Circuit held that a nurse who knew a detainee had elevated vital signs did not act with deliberate indifference when she failed to personally examine him.  The nurse had instructed officers to monitor the detainee's condition every thirty minutes, and no one had reported that he "was experiencing difficulties or that his condition was worsening."  *Id.* at 345–46.  "While

49

it might be evidence of negligence, [the nurse's] failure to go to the jail annex and personally assess Henson [after learning of his elevated vital signs] does not support a finding of deliberate indifference." *Id*. at 346.  Even if the vital signs "evidenced a hypertensive crisis and required Henson's immediate transport to the hospital," the nurse's "failure to order Henson's transport to the hospital immediately after receiving notice of his elevated vital signs is in the category of malpractice, not deliberate indifference." *Id*.  "There is nothing on which it can be inferred that [the nurse] 'refused to treat [the detainee], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id*. at 346–47 (quoting *Domino*, 239 F.3d at 756).

So too here.  Although Newsome's death is a tragedy, the evidence shows that Green was treating her for what he thought was a non-serious condition.  And even if Green learned of Newsome's critical values at 10:39 a.m. and understood she was experiencing a medical crisis, Green's delay in calling Dr. Corley or emergency medical services was "in the category of malpractice, not deliberate indifference." *Id*. at 346.  Further, there is no evidence that Green's conduct was objectively unreasonable in light of clearly established law.  *See, e.g.*, *Baldwin v. Dorsey*, 964 F.3d 320, 328–29 (5th Cir. 2020) (holding that jail official did not act unreasonably when he delayed sending detainee to hospital despite detainee's risk of suicide and request for hospital where other tests and measures were taken for the detainee's wellbeing); *cf., e.g.*, *Easter*, 467 F.3d at 465 (prison official acted objectively

unreasonably by "offer[ing] no treatment options" whatsoever to patient exhibiting symptoms of known heart condition).  Accordingly, Green is entitled to qualified immunity, and his summary judgment motion is **GRANTED**.[12]

### E. DEFENDANT **TAKET**

Plaintiffs allege that TAKET Holdings, L.L.C. was the "contract medical services provider" for Anderson County, Texas, during the relevant period, and that it violated Newsome's constitutional rights by failing to provide her with appropriate medical care.  Docket No. 51 ¶¶ 6, 111–14.  TAKET moves for summary judgment on the ground that its contract with Anderson County did not become effective until January 1, 2019—more than six months after Newsome died.  Docket No. 208 at 19; *id.*, Ex. R; *id.*, Ex. Q at 000556–69.[13]

---

[12] Plaintiffs also move for discovery sanctions under Federal Rule of Civil Procedure 37(e) regarding several allegedly lost or deleted text messages from June 15 among Green, Pierson, and Choate, which Plaintiffs "believe[] to be related to Ms. Newsome's medical condition."  Docket No. 168 at 7; Docket No. 214 at 13–14.  All three Defendants testified or represented through counsel that they had lost, broken, or upgraded their old phones and thus no longer had access to their contents.  *See* Docket No. 168, Ex. I at 9–10; *id.*, Ex. K at 30; *id.*, Ex. M; Docket No. 218, Ex. B at 55–56.  Plaintiffs ask the Court to presume the lost information was unfavorable to Defendants.  Docket No. 214 at 13–14.  But Rule 37(e)(2) permits such a presumption "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation."  *See also Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) ("We permit an adverse inference against the spoliator or sanctions against the spoliator only upon a showing of 'bad faith' or 'bad conduct.'") (citation omitted).  And Plaintiffs fail to present any evidence that Defendants acted with such intent here.  *See, e.g., Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 493 (N.D. Tex. 2016), *objections overruled sub nom. Orchestratehr, Inc. v. Trombetta*, 2016 WL 5942223 (N.D. Tex. Oct. 13, 2016) (denying Rule 37 sanctions despite facts that party knew or should have known deleted emails might be relevant to pending litigation, admitted to intentionally deleting emails, and made equivocal statements about whether his intent was to delete emails in ordinary course of business or to "cover his tracks" because plaintiffs "have failed to show that [the party] destroyed any emails in bad faith or with the requisite intent")).  Plaintiffs' motion is thus **DENIED**.

[13] TAKET also argues in the alternative that it should share in the qualified immunity of its sole members, Dr. Corley and Green.  Docket No. 208 at 17.  Because the Court can resolve TAKET's motion on other grounds, it need not address this alternative theory.

Plaintiffs do not dispute the effective date of TAKET's contract and fail to provide any evidence—or argument—supporting liability for TAKET.  *See* Docket No. 220.  Accordingly, the Court **GRANTS** TAKET's motion for summary judgment. *See Block v. Alpharma, Inc.*, 2004 WL 555480, at *2 (N.D. Tex. Mar. 17, 2004) (granting defendant's summary judgment motion for lack of causation where it was undisputed defendant did not acquire the company responsible for plaintiff's injury until after the injury had occurred).

## V.

For the foregoing reasons, the Court **GRANTS** Defendants Corley and TAKET's motion for summary judgment (Docket No. 208), **GRANTS** Defendant Green's motion for summary judgment (Docket No. 209), and **GRANTS** Defendants Carpenter, Choate, Hughes, Jones, Strong, Taylor, Wesson, Wickersham, and Wilson's motion for summary judgment (Docket No. 210).  Plaintiffs' claims against each of these Defendants are **DISMISSED WITH PREJUDICE**.  All other pending motions are **DENIED as moot**.[14]

**Signed this**

**May 5, 2022**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE

---

[14] The Court has considered all evidentiary objections raised by the parties.  To the extent the Court has not explicitly ruled on those objections in this memorandum opinion and order, all remaining objections are **DENIED** as moot.